IN THE COURT OF APPEALS OF TENNESSEE
AT KNOXVILLE
Assigned on Briefs April 3, 2012

IN RE **DAKOTA L. M.**

**Appeal from the Juvenile Court for Greene County**
**No. J23438    Hon. Kenneth N. Bailey, Jr., Judge**

—————————————

**No. E2011-02177-COA-R3-PT-FILED-MAY 31, 2012**

—————————————

This is a termination of parental rights case in which the Tennessee Department of Children's Services sought to terminate the parental rights of Brandon M.[1] and Anthony T. to their minor child.[2] The trial court terminated Brandon M.'s parental rights, finding that there was clear and convincing evidence to support termination based upon, abandonment, substantial non-compliance with the permanency plans, and persistence of conditions and that termination of her parental rights was in the best interest of the child. Brandon M. appeals the court's best interest determination. We affirm the decision of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Juvenile Court**
**Affirmed; Case Remanded**

JOHN W. MCCLARTY, J., delivered the opinion of the court, in which HERSCHEL P. FRANKS, P.J., and CHARLES D. SUSANO, JR., J., joined.

Joseph O. McAfee, Greeneville, Tennessee, for the appellant, Brandon M.

Robert E. Cooper, Jr., Attorney General and Reporter, and Joshua Davis Baker, Assistant Attorney General, General Civil Division, Nashville, Tennessee, for the appellee, Tennessee Department of Children's Services.

Whittney N. L. Good, Bulls Gap, Tennessee, guardian ad litem for the minor, Dakota L. M.

———————————

[1]This court has a policy of protecting the identity of children in termination of parental rights cases by initializing the last names of the parties and the children.

[2]Anthony T. voluntarily surrendered his parental rights to the child at trial and is not a party to this appeal.

**OPINION**

**I. BACKGROUND**

Most of the information in the factual background will pertain to Brandon M. ("Mother") because Anthony T. ("Father") surrendered his parental rights. Dakota L. M. ("the Child") was born to Mother and Father (collectively "the Parents") on March 17, 2007. The Parents were not married, but Father legitimated the Child by an order of paternity.

The Child was removed from Mother's home and placed with Father on July 7, 2010, when Mother was found passed out in her apartment, leaving the Child, who was three years old, unsupervised. The Child was observed running around the apartment spraying computer dust cleaner at himself and at Mother. Law enforcement officers found nine empty cans of dust cleaner. Mother later admitted that she had passed out from "huffing" dust cleaner and that she "huffed" a can of dust cleaner on a daily basis. Mother was arrested and charged with reckless endangerment and pled guilty to misdemeanor reckless endangerment.

Mother was ordered to obtain a drug screen and submit the results to the Tennessee Department of Children's Services ("TDCS"). After Mother's positive test result for marijuana was submitted to the court, Mother stipulated that the Child was dependent and neglected. The court agreed and adjudicated the Child as dependent and neglected on August 17, 2010. That same day, Father tested positive for opiates and a "faint line of marijuana." The court removed the Child from Father and placed the Child in the custody of TDCS.[3] The court subsequently directed that the Parents would not be allowed supervised visitation with the Child until they had passed two drug screens.

TDCS developed a permanency plan for the Child with Mother's participation in September 2010. The plan contained four desired outcomes that required Mother to complete specific action steps. The first desired outcome provided, "[Mother] will be drug free." To complete that outcome, Mother was required to

> submit to random drug screens and test negative, complete an inpatient drug rehabilitation program and attend Narcotics Anonymous prior to her acceptance into the program, refrain from abusing drugs, and follow recommended treatment upon discharge from the rehabilitation program.

---

[3]The Child was first placed with the paternal grandparents but was subsequently placed in foster care at grandmother's request.

The second outcome provided, "[The Child] will have adequate supervision," requiring Mother to provide adequate supervision for the Child while he is in her care. The third outcome provided, "[Mother] will be mentally stable," requiring Mother to complete a mental health intake and follow recommendations. The fourth outcome provided, "[The Child] will have a permanent, stable home." To complete that outcome, Mother was required to provide a safe, stable home free from drugs and alcohol and demonstrate her ability to financially provide for the Child by paying child support. Mother signed the plan and the notice of criteria and procedures for termination of parental rights. The court ratified the plan but subsequently held the child support requirement in abeyance.

Mother was admitted into an outpatient rehabilitation program and began attending parenting classes. She was discharged from the program for lack of attendance and was eventually terminated from the program. Less than one month after the creation of the permanency plan, Mother was arrested for driving under the influence ("DUI"). She pled guilty to DUI, first offense and received a sentence of 11 months and 29 days, suspended to probation. Three days after completing her service of approximately 28 days in jail for her reckless endangerment conviction, she was arrested for DUI, second offense and simple possession of a Schedule II controlled drug.[4]

Mother was admitted into an inpatient rehabilitation program in December 2010. After passing two drug screens and graduating from the program, she was advised to attend Narcotics Anonymous meetings. Mother visited the Child on January 14, 2011. Following that visit, she failed to submit to any additional drugs screens and was unable to secure any future visitation.

In February 2011, Mother pled guilty to the aforementioned DUI, second offense and simple possession charges. She received sentences of 11 months and 29 days, suspended to probation following the service of 45 days in the county jail for the DUI conviction and 10 days in the county jail for the simple possession conviction. As a result, Mother was in jail when the second permanency plan was created in March 2011. The second plan contained similar requirements as contained in the first plan but required Mother to obtain stable housing for the Child for a period of at least four months and participate in an outpatient alcohol and drug relapse program. The court ratified the plan without adjusting the child support obligation.

Mother was released from jail on April 9, 2011. Ten days later, she was arrested and charged with theft of property valued at less than $500. Ten days later, she was charged with

---

[4]Officers found a Xanax laying in the passenger seat of the car.

public intoxication and violation of probation after being observed "nodding off" in the courtroom.[5] In May 2011, she pled guilty to all charges and received a fine for the public intoxication conviction, a sentence of 11 months and 29 days, suspended to probation following the service of 2 days in the county jail for the theft conviction, and was ordered to serve ten days in the county jail for violating her probation.

On June 14, 2011, TDCS filed a petition to terminate Mother's parental rights. The grounds asserted for termination were abandonment for failure to visit, submit child support, and exhibiting a wanton disregard for the welfare of the Child; substantial noncompliance with the permanency plans; and persistence of conditions. Following the filing of the termination petition, Mother submitted urine samples for two drug screens and was able to visit the Child on June 21, 2011 and June 28, 2011. She visited the Child again on July 14, 2011, but refused to submit to any further drug screens after that visitation.

A hearing on the petition was held on August 23, 2011. Kimberly Shirley, a family service worker for TDCS, testified that she first had contact with the Child in August 2010, when the Child was removed from Mother. Ms. Shirley recalled that after Mother attended her first visitation with the Child, she scheduled a drug screen for Mother but that Mother failed to arrive on the scheduled day. She related that Mother called the next day, explaining that she had not come to the office because she was sick. Ms. Shirley stated that Mother's voice was slurred during the telephone call. She visited Mother's home a few days later to obtain a urine sample, but Mother refused to provide a sample, stating that she would come to the office later in the day. Mother never came to the office. Ms. Shirley scheduled a drug screen for Mother on February 3, 2011, but Mother refused the test. She went to the jail to obtain a sample from Mother the next day, but Mother refused to submit a urine sample. She recalled that the officers at the jail called her and told her that Mother refused to provide a sample but admitted to ingesting Xanax before reporting to jail.

Ms. Shirley testified that while Mother was incarcerated from February 4 through April 10, 2011, she was not incarcerated during the four months prior to February and was not under any kind of disability that would have kept her from visiting the Child more than once during that time period. She attempted to obtain a drug screen from Mother after the visitation on July 14, 2011. She recalled that Mother claimed that she had to leave because her transportation had arrived but assured her that she would return the next day. Mother never returned. Ms. Shirley stated that when she attempted to schedule another drug screen to secure another visit with the Child, Mother delayed the scheduled screen to another date. On the appointed date, Mother informed Ms. Shirley that she did not have the money to pay

---

[5]Mother admitted that she had taken prescription pills prior to accompanying her friend to a court hearing.

for a drug screen but that she would have the money in a few days. Ms. Shirley testified that to date, Mother had not submitted another urine sample.

Relative to Mother's compliance with the first permanency plan, Ms. Shirley admitted that Mother had completed the inpatient drug rehabilitation program, had submitted to a mental health intake, was involved with case management, and had medication management and therapy. She opined that Mother failed to follow the recommendations from the inpatient program because Mother never attended Narcotics Anonymous meetings and because Mother failed to submit to drug screens as agreed. She related that as a result of Mother's noncompliance, Mother only participated in one visitation with the Child prior to the filing of the termination petition. She stated that Mother also failed to provide any information that would indicate that her home was free from alcohol and drugs. She testified that relative to the second permanency plan, Mother failed to provide stable housing for the Child and participate in an outpatient alcohol and drug relapse program.

Ms. Shirley said that she helped Mother secure placement in the inpatient rehabilitation program, scheduled drug screens, referred Mother to mental health programs, held child and family team meetings, and facilitated the one visitation that Mother attended before the petition was filed. She called Mother numerous times and went to Mother's residence and the jail to attempt to obtain samples for drug screens. She opined that Mother was uncooperative as evidenced by her refusal to answer and return telephone calls, by not coming to the office at the appointed times, and by not submitting to the drug screens.

Ms. Shirley said that the Child had been in custody three days short of ten months when the petition was filed. She believed that Mother failed to adjust her circumstances, conduct, or condition in order to make it safe for the Child to return home. She stated that Mother did not have a meaningful relationship with the Child and that the Child was residing in a steady home with foster parents that wished to adopt him. She believed that continuation of the Child's relationship with Mother would impede his chance at early integration into a safe, stable, and permanent home. She believed that it was unlikely that Mother would remedy the conditions that led to removal within a suitable amount of time.

Tina Spear, a case manager at Frontier Health, stated that she helped Mother and her other clients obtain community resources. She recalled that Mother had been her client since October 2010 and that she had met with Mother numerous times throughout her relationship with Mother. She related that she also had several telephone conversations with Mother throughout that time. She believed that Mother had complied with her recommendations but admitted that she was not Mother's individual therapist.

Raymond B. ("Grandfather") testified that he was Mother's grandfather and that Mother had resided with him and her grandmother since the Child was removed. He stated that Mother was employed and that he did not believe that she was using drugs. He related that she provided clothes and numerous toys for the Child throughout the Child's placement in TDCS custody. He admitted that she was residing in his residence when she was arrested for DUI, public intoxication, and theft of property. He explained that he was not aware that she was abusing drugs and alcohol while residing in his home.

Mother testified that she was employed as a cashier and had held that position since May 2011. She worked from 35 to 40 hours per week and expected to be promoted at some point. She admitted that she relapsed after she completed the inpatient rehabilitation program but insisted that her problems with drugs and alcohol had been remedied. She said that she attended Narcotics Anonymous meetings but agreed that she had not attended any meetings since she was charged with public intoxication in April 2011, when her probation was violated and she had to serve ten days in jail. She admitted that she had not seen her alcohol and drug counselor since May 2011 but said that she had a meeting scheduled for September.

Mother related that Ms. Shirley failed to return her telephone calls and would only answer her telephone calls when she blocked her telephone number. She stated that Ms. Shirley did not tell her to come back for a drug screen following her July visit but that she told someone at the front desk that she would call Ms. Shirley on Monday because she could not find her. She explained that she did not submit to another drug screen following her visit because she did not have the money to pay for the screen.

Mother said that her visitation with the Child never lasted the allotted time of two hours because the Child wanted to leave after approximately an hour and a half in the small visitation room. She stated that the foster parents ended another visitation early because they had other plans. She insisted that despite the fact that she had only visited the Child four times in the past year, her bond with the Child remained strong because she cared for the Child for the three and a half years prior to his removal. She said that she bought food for the Child during two of the visits and gave the Child gifts for his birthday and holidays.

The trial court denied termination based upon the statutory ground of Mother's failure to remit child support because the child support obligation in the first permanency plan had been held in abeyance. However, the court entered oral findings as well as a written order, terminating Mother's parental rights. In its written order, the court specifically found that Mother had not "sought appropriate treatment to address her alcohol and drug issues." The court ruled that clear and convincing evidence supported termination of Mother's rights based upon her abandonment of the Child by willfully failing to visit during the four months immediately preceding the filing of the petition, her abandonment of the Child by willfully

failing to visit during the four months preceding her incarceration, her exhibition of a wanton disregard for the welfare of the Child due to her pre-incarceration conduct, her failure to substantially comply with the requirements contained in the permanency plans, and her failure to remedy the conditions which led to removal. The court further ruled that TDCS had used reasonable efforts to assist Mother in reuniting with the Child and that termination of Mother's parental rights was in the best interest of the Child. This timely appeal followed.

## II. ISSUE

We consolidate and restate the issue raised on appeal by Mother as follows:

Whether termination of Mother's parental rights was in the best interest of the Child.

## III. STANDARD OF REVIEW

Parents have a fundamental right to the care, custody, and control of their children. *Stanley v. Illinois*, 405 U.S. 645 (1972); *In re Drinnon*, 776 S.W.2d 96, 97 (Tenn. Ct. App. 1988). This right "is among the oldest of the judicially recognized liberty interests protected by the Due Process Clauses of the federal and state constitutions." *In re M.J.B.*, 140 S.W.3d 643, 652-53 (Tenn. Ct. App. 2004). "Termination of a person's rights as a parent is a grave and final decision, irrevocably altering the lives of the parent and child involved and 'severing forever all legal rights and obligations' of the parent." *Means v. Ashby*, 130 S.W.3d 48, 54 (Tenn. Ct. App. 2003) (quoting Tenn. Code Ann. § 36-1-113(I)(1)). "'[F]ew consequences of judicial action are so grave as the severance of natural family ties.'" *M.L.B. v. S.L.J.*, 519 U.S. 102, 119 (1996) (quoting *Santosky v. Kramer*, 455 U.S. 745, 787 (1982)).

While parental rights are superior to the claims of other persons and the government, they are not absolute and may be terminated upon appropriate statutory grounds. *See Blair v. Badenhope*, 77 S.W.3d 137, 141 (Tenn. 2002). Due process requires clear and convincing evidence of the existence of the grounds for termination of the parent-child relationship. *In re Drinnon*, 776 S.W.2d at 97. A parent's rights may be terminated only upon

(1) [a] finding by the court by clear and convincing evidence that the grounds for termination of parental or guardianship rights have been established; and

(2) [t]hat termination of the parent's or guardian's rights is in the best interest [] of the child.

Tenn. Code Ann. § 36-1-113(c). "[A] court must determine that clear and convincing evidence proves not only that statutory grounds exist [for the termination] but also that termination is in the child's best interest." *In re Valentine*, 79 S.W.3d 539, 546 (Tenn. 2002). The existence of at least one statutory basis for termination of parental rights will support the trial court's decision to terminate those rights. *In re C.W.W.*, 37 S.W.3d 467, 473 (Tenn. Ct. App. 2000), *abrogated on other grounds by In re Audrey S.*, 182 S.W.3d 838 (Tenn. Ct. App. 2005).

The heightened burden of proof in parental termination cases minimizes the risk of erroneous decisions. *In re C.W.W.*, 37 S.W.3d at 474; *In re M.W.A., Jr.*, 980 S.W.2d 620, 622 (Tenn. Ct. App. 1998). Evidence satisfying the clear and convincing evidence standard establishes that the truth of the facts asserted is highly probable. *State v. Demarr*, No. M2002-02603-COA-R3-JV, 2003 WL 21946726, at *9 (Tenn. Ct. App. Aug. 13, 2003). This evidence also eliminates any serious or substantial doubt about the correctness of the conclusions drawn from the evidence. *In re Valentine*, 79 S.W.3d at 546; *In re S.M.*, 149 S.W.3d 632, 639 (Tenn. Ct. App. 2004); *In re J.J.C.*, 148 S.W.3d 919, 925 (Tenn. Ct. App. 2004). It produces in a fact-finder's mind a firm belief or conviction regarding the truth of the facts sought to be established. *In re A.D.A.*, 84 S.W.3d 592, 596 (Tenn. Ct. App. 2002); *Ray v. Ray*, 83 S.W.3d 726, 733 (Tenn. Ct. App. 2001); *In re C.W.W.*, 37 S.W.3d at 474.

In 2010, the Tennessee Supreme Court provided guidance to this court in reviewing cases involving the termination of parental rights:

A reviewing court must review the trial court's findings of fact de novo with a presumption of correctness under [Rule 13(d) of the Tennessee Rules of Appellate Procedure]. *See In re Adoption of A.M.H.*, 215 S.W.3d [793,] 809 [(Tenn. 2007)]. In light of the heightened burden of proof in proceedings under [Tennessee Code Annotated section] 36-1-113, the reviewing court must then make its own determination regarding whether the facts, either as found by the trial court or as supported by a preponderance of the evidence, provide clear and convincing evidence that supports all the elements of the termination claim. *State Dep't of Children's Servs. v. Mims*, 285 S.W.3d [435,] 447-48 [(Tenn. Ct. App. 2008)]; *In re Giorgianna H.*, 205 S.W.3d 508, 516 (Tenn. Ct. App. 2006); *In re S.M.*, 149 S.W.3d 632, 640 n. 13 (Tenn. Ct. App. 2004). Appellate courts conduct a de novo review of the trial court's decisions regarding questions of law in termination proceedings. However, these decisions, unlike the trial court's findings of fact, are not presumed to be correct. *In re Angela E.*, 303 S.W.3d [240,] 246 [(Tenn. 2010)]; *In re Adoption of A.M.H.*, 215 S.W.3d at 809.

*In re Bernard T.*, 319 S.W.3d 586, 596-97 (Tenn. 2010).

## IV.  DISCUSSION

Mother does not challenge the court's ruling concerning the statutory grounds for termination.  However, TDCS raised and argued these issues in its brief.  Although we have reviewed the record and the proof presented therein, we will not discuss these issues.  It suffices us to say that this court is satisfied that the trial court's ruling as to the statutory grounds for termination is supported by clear and convincing evidence.

Mother contends that in determining whether termination of her parental rights was in the best interest of the Child, the court failed to properly consider the applicable factors as set forth in Tennessee Code Annotated section 36-1-113(i).  TDCS responds that the court properly found that termination of Mother's parental rights was in the best interest of the Child.

In determining whether termination of Mother's parental rights was in the best interest of the Child, we are guided by the non-exhaustive list of factors provided in Tennessee Code Annotated section 36-1-113:

> (i)  In determining whether termination of parental or guardianship rights is in the best interest of the child . . . the court shall consider, but is not limited to, the following:
>
> (1) Whether the parent or guardian has made such an adjustment of circumstance, conduct, or conditions as to make it safe and in the child's best interest to be in the home of the parent or guardian;
>
> (2) Whether the parent or guardian has failed to effect a lasting adjustment after reasonable efforts by available social services agencies for such duration of time that lasting adjustment does not reasonably appear possible;
>
> (3) Whether the parent or guardian has maintained regular visitation or other contact with the child;
>
> (4) Whether a meaningful relationship has otherwise been established between the parent or guardian and the child;

(5) The effect a change of caretakers and physical environment is likely to have on the child's emotional, psychological and medical condition;

(6) Whether the parent or guardian, or other person residing with the parent or guardian, has shown brutality, physical, sexual, emotional or psychological abuse, or neglect toward the child, or another child or adult in the family or household;

(7) Whether the physical environment of the parent's or guardian's home is healthy and safe, whether there is criminal activity in the home, or whether there is such use of alcohol or controlled substances as may render the parent or guardian consistently unable to care for the child in a safe and stable manner;

(8) Whether the parent's or guardian's mental and/or emotional status would be detrimental to the child or prevent the parent or guardian from effectively providing safe and stable care and supervision for the child; or

(9) Whether the parent or guardian has paid child support consistent with the child support guidelines promulgated by the department pursuant to [section] 36-5-101.

Tenn. Code Ann. § 36-1-113(i). "This list is not exhaustive, and the statute does not require a trial court to find the existence of each enumerated factor before it may conclude that terminating a parent's parental rights is in the best interest of a child." *In re M.A.R.*, 183 S.W.3d 652, 667 (Tenn. Ct. App. 2005). The General Assembly has also stated that "when the best interest[] of the child and those of the adults are in conflict, such conflict shall always be resolved to favor the rights and the best interest[] of the child, which interests are hereby recognized as constitutionally protected." Tenn. Code Ann. § 36-1-101(d); *see also White v. Moody*, 171 S.W.3d 187, 194 (Tenn. Ct. App. 2004) (holding that when considering a child's best interest, the court must take the child's perspective, rather than the parent's).

In this case, the trial court specifically found that Mother had failed to adjust her "circumstances, conduct and conditions as to make it safe and in the [C]hild's best interest[] to go home," that Mother had failed to visit the Child on a regular basis and had not maintained a meaningful relationship with the Child, and that the Child was presently residing in a safe and stable home.

We agree with the trial court's findings and ruling on this issue and believe that even more of the best interest factors weighed heavily against Mother. The proof is overwhelming that Mother failed to make an adjustment of her circumstance, conduct and conditions as to make it safe and in the Child's best interest to go home. Tenn. Code Ann. § 36-1-113(i)(1).

-10-

Mother's major problem was that of substance abuse and addiction. As a result of this problem, she was found unconscious, while her three-year-old child was running around the house spraying dust cleaner at himself and her. It could easily have been said that the Child was mimicking Mother's behavior. Yet, after the Child was removed, Mother failed to remedy her problems and was arrested twice for DUI and once for public intoxication. In addition, Mother's refusal to submit to drug screens served as an indicator that she was still abusing substances. The Child was not safe at home with Mother, and Mother has shown no positive steps on her behalf to remedy the conditions that made her home unsafe for the Child. Thus, Mother failed to make a lasting adjustment of her circumstances, despite being given adequate time to accept responsibility for her actions and improve her circumstances by using the available resources and support. Tenn. Code Ann. § 36-1-113(i)(2).

Mother also failed to regularly visit the Child while he was in TDCS custody. Tenn. Code Ann. § 36-1-113(i)(3). All that was required of Mother was that she pass two drug screens in order to visit with the Child. Yet, she simply refused to comply and submit samples when requested and only visited the Child one time prior to the filing of the termination petition. To date, Mother has only visited the Child four times since he was removed from the home. Mother's conduct of avoiding the drug screens and her conduct that led to her incarceration were directly under her control. Her refusal to submit to drug screens hindered her ability to maintain a meaningful relationship with the Child, who requested to end the visits early. Tenn. Code Ann. § 36-1-113(i)(4). Additionally, the Child presently resides with foster parents that wish to adopt him. The testimony presented at trial reflects that the foster home is a safe and stable placement with foster parents that will show him attention and address his needs. Removing the Child from the foster parents and returning him to Mother would likely traumatize the Child. Tenn. Code Ann. § 36-1-113(i)(5).

Questions remain as to whether the physical environment of Mother's home is healthy and safe. The testimony reflected that Mother intended to provide a home for the Child at her grandparents' house. Grandfather testified that Mother was residing in the home when she was arrested three times, twice for DUI and once for public intoxication. Mother's inability to remedy her substance abuse issues is also particularly concerning as to whether any physical environment with her would be safe given the way in which the Child was initially found, unsupervised and playing with a potentially dangerous substance. Tenn. Code Ann. § 36-1-113(i)(7).

We acknowledge that there were no allegations of physical abuse, that Mother's mental and emotional status do not appear to be detrimental to the Child, and that her child support obligation was held in abeyance. Tenn. Code Ann. § 36-1-113(i)(6), (8), (9). However, we believe the above considerations overcome these positive factors. We do not wish to discount Mother's love for the Child and the three years that she spent raising the

Child. However, Mother's concern for the Child's safety should have always been paramount. Instead, Mother allowed the Child to languish in foster care while she failed to remedy the conditions that led to removal. With all of the above considerations in mind, we conclude that the evidence in the record does not preponderate against the trial court's finding that termination of Mother's parental rights was in the best interest of the Child. Having already concluded that statutory grounds for termination were proven by clear and convincing evidence, we affirm the trial court's order terminating Mother's parental rights to the Child.

## V. CONCLUSION

The judgment of the trial court is affirmed, and the case is remanded for such further proceedings as may be necessary. Costs of the appeal are taxed to the appellant, Brandon M.

_____
JOHN W. McCLARTY, JUDGE